## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RIVKA LIVNAT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:14-cv-00668-CKK |
| | ) | |
| THE PALESTINIAN AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT THE PALESTINIAN AUTHORITY'S MOTION TO DISMISS

Joseph B. Espo (D.C. Bar No. 429699)
Andrew D. Levy (D.C. Bar No. 458998)
Jessica P. Weber (admitted *pro hac vice*)
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, Maryland  21202-6701
Telephone:  (410) 962-1030
Facsimile:  (410) 385-0869
jbe@browngold.com
adl@browngold.com
jweber@browngold.com

Alan I. Baron (D.C. Bar No. 340273)
975 F. Street, NW, Suite 100
Washington, DC 20004
Telephone:  (202) 828-3589
Facsimile:  (202) 828-5393
abaron@seyfarth.com

*Attorneys for Plaintiffs*

Dated:  June 13, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 1

    I.   THE PALESTINIAN AUTHORITY AND ITS POLICY AND
        PRACTICE OF INCITING AND REWARDING ACTS OF
        TERROR ........................................................................................................ 1

    II.  MOHAMMED SAABNEH: PA SECURITY OFFICER AND
        TERRORIST ................................................................................................... 2

    III. THE PA SELECTS SAABNEH TO LEAD THE SECURITY
        FORCES AT JOSEPH'S TOMB: AN IMPORTANT JEWISH
        HOLY SITE AND DESTINATION .................................................................. 4

    IV. THE APRIL 24, 2011 TERRORIST ATTACK .............................................. 4

ARGUMENT ............................................................................................................................... 6

    I.   THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS
        UNDER THE ANTI-TERRORISM ACT. ...................................................... 6

        A.   Plaintiffs have adequately pleaded an act of international
            terrorism. ............................................................................................... 6

        B.   Plaintiffs who are U.S. nationals have alleged a
            cognizable injury. .................................................................................. 9

        C.   The PA is vicariously liable for the acts of Saabneh and
            the security officers under his command. ............................................ 14

            1.   The PA is vicariously liable for the conduct of its
               employees. .................................................................................. 14

            2.   *Monell* has no bearing on liability under the ATA. ......................... 16

            3.   Plaintiffs' allegations establish the PA's liability
               under the *Monell* standard ............................................................. 18

        D.   The PA may be held liable for aiding and abetting under
            the ATA. ............................................................................................... 20

II. PERSONAL JURISDICTION. ........................................................................ 21

    A.    General personal jurisdiction. ............................................................ 21

        1.  The PA does not have constitutional due process
            rights. ......................................................................... 22

            a.  Because the PA is a foreign government of a
                non-sovereign state, it has no constitutional due
                process rights. ....................................................... 22

            b.  Courts have held that other non-sovereign
                governments and political entities are also not
                entitled to constitutional due process rights. .......................... 25

        2.  *Daimler* and *Goodyear* do not prohibit the exercise of
            personal jurisdiction over the PA. ...................................... 27

            a.  Daimler and Goodyear concerned rights arising
                under the Fourteenth Amendment, not the Fifth
                Amendment. .......................................................... 27

            b.  The Supreme Court's reasoning in Daimler and
                Goodyear was shaped by the very different
                factual context in those cases. .................................. 30

        3.  The PA has sufficient contacts with the United States
            to permit the exercise of personal Jurisdiction. .............................. 32

    B.    Specific jurisdiction. ............................................................. 35

III. VENUE IS PROPER IN THE DISTRICT OF COLUMBIA
     AND THE PA WAS PROPERLY SERVED WITH
     PROCESS. ................................................................................ 40

IV. THE NEGLIGENCE CLAIMS OF ALL PLAINTIFFS AND
     THE BATTERY AND ASSAULT CLAIMS OF MINOR
     PLAINTIFFS SHOULD REMAIN IN THE CASE. ..................................... 41

    A.  Assault and battery. ............................................................... 41

    B.  Negligence. ....................................................................... 44

CONCLUSION ............................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Abecassis v. Wyatt*,
    785 F. Supp. 2d 614 (S.D. Tex. 2011) ............................................................ 16

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) .................................................................. 44

*Anderson v. The Islamic Republic of Iran*,
    753 F. Supp. 2d 68 (D.D.C. 2010) ............................................................ 12, 13

*Aucoin v. Prudential Ins. Co. of Am.*,
    959 F. Supp. 2d 185 (D.D.C. 2013) ............................................................... 28

*Bally Gaming, Inc. v. Kappos*,
    789 F. Supp. 2d 41 (D.D.C. 2011) ................................................................. 28

*Bechtel & Cole v. Graceland Broadcasting, Inc.*,
    No. 92-7190, 1994 WL 85047 (D.C. Cir. Mar. 9, 1994) ................................. 35

* *Biton v. Palestinian Authority*,
    310 F. Supp. 2d 172 (D.D.C. 2004) ....................................................... passim

*Blais v. Islamic Republic of Iran*,
    459 F. Supp. 2d 40 (D.D.C. 2006) .................................................................. 13

*Boim v. Holy Land Foundation for Relief and Development*,
    549 F.3d 685 (7th Cir. 2008 ...................................................................... 8, 21

*Boim v. Quranic Literacy Institute*,
    291 F.3d 1000 (7th Cir. 2002) ......................................................... 13, 14, 17

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ......................................................................................... 36

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) .............................. 20

*Calder v. Jones*,
    465 U.S. 783 (1983) ......................................................................................... 37

*City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty.,*
    *Ill.*, 986 F.2d 1142 (7th Cir. 1993) ................................................................. 26

*City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157 (D.D.C. 1980) ............................... 26

*Crane v. New York Zoological Soc'y*,
   894 F.2d 454 (D.C. Cir. 1990) ...................................................................................... 6

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ......................................................................................... passim

*Daliberti v. Iraq*,
   97 F. Supp. 2d 38 (D.D.C. 2000) ......................................................................... 36, 37, 38

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) .................................................................................................... 29

*El Paso Cnty. Water Imp. Dist. No.1 v. Int'l Boundary and Water Comm'n*,
   701 F. Supp. 121 (W.D. Tex. 1988) ............................................................................... 26

*Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*,
   355 A.2d 808 (D.C. 1976) ............................................................................................ 35

* *Estate of Klieman v. Palestinian Auth.*,
   467 F. Supp. 2d 107 (D.D.C. 2006) ......................................................................... 32, 33

*Estate of Klieman v. Palestinian Auth.*,
   547 F. Supp. 2d 8 (D.D.C. 2008) .................................................................................. 41

*Estate of Parsons v. Palestinian Authority*,
   661 F.3d 118 (D.C. Cir. 2011) ................................................................................. 16, 18

*Estate of Parsons v. Palestinian Authority*,
   715 F. Supp. 2d 27 (D.D.C. 2010) ................................................................................ 15

* *Estates of Ungar v. Palestinian Auth.*,
   325 F. Supp. 2d 15 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005) ...................... passim

*Estates of Ungar v. The Palestinian Authority*,
   304 F. Supp. 2d 232 (D.R.I. 2004) ................................................................................ 14

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ....................................................................................... 38

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
   582 F.3d 393 (2d Cir. 2009) ......................................................................................... 23

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 542 (E.D.N.Y. 2012) ........................................................................... 16

*Goldberg v. UBS AG,*
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) .................................................. 11, 13, 29

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
  131 S. Ct. 2846 (2011) ................................................................... passim

*Griffin v. Oceanic Contractors, Inc.,*
  458 U.S. 564 (1982) ............................................................................ 29

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
  104 F. Supp. 2d 279 (S.D.N.Y. 2000) ................................................... 31

*Handley v. Ind. & Mich. Elec. Co.,*
  732 F.2d 1265 (6th Cir. 1984) ............................................................. 28

*Hanson v. Denckla,*
  357 U.S. 235 (1958) ............................................................................ 35

*Hertz Corp. v. Friend,*
  559 U.S. 77 (2010) .............................................................................. 30

*In re Chiquita Brands Int'l,*
  690 F. Supp. 2d 1296 (S.D. Fla. March 27, 2010) .............................. 20

*In re Islamic Republic of Iran Terrorism Litig.,*
  659 F. Supp. 2d 31 (D.D.C. 2009) ...................................................... 31

*In re Scott Cable Commc'ns, Inc.,*
  259 B.R. 536 (D. Conn. 2001) ............................................................ 26

*Ins. Corp. of Ire. v. Compagnie des Bauxites de Guinee,*
  456 U.S. 694 (1982) ............................................................................ 22

*Jones v. Horne,*
  634 F.3d 588 (D.C. Cir. 2011) ............................................................ 18

*Jones v. Town of E. Haven,*
  691 F.3d 72 (2d Cir. 2012) ................................................................. 18

*Knox v. The Palestine Liberation Organization,*
  442 F. Supp. 2d 62 (S.D.N.Y. 2006) ................................................... 13

*Lee v. City of Philadelphia,*
  No. 08-CV-862, 2008 WL 2697320 (E.D. Pa. July 3, 2008) ............... 17

*Lelchook v. Commerzbank,*
    10 Civ. 5795(AKH), 2011 WL 4087448 (S.D.N.Y. August 2, 2011)............................ 13

*Linde v. Arab Bank, PLC,*
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ............................................................. 11

*Livnat v. Palestinian Auth.,*
    No. 13-498, DE 6 (E.D. Va. June 5, 2013) ...................................................... 23

*Max Daetwyler Corp. v. R. Meyer,*
    762 F.2d 290 (3d Cir. 1985)......................................................................... 28

*McKesson v. Islamic Republic of Iran,*
    185 F.R.D. 70 (D.D.C. 1999).......................................................................... 32

*Mendelsohn v. Meese,*
    695 F. Supp. 1474 (S.D.N.Y. 1988)................................................................. 25

*Miller v. County of Nassau,*
    467 F. Supp. 2d 308 (E.D.N.Y. 2006) ............................................................ 18

*Monell v. Dep't of Social Services,*
    436 U.S. 658 (1978)........................................................................... passim

*Monster Cable v. Euroflex,*
     642 F. Supp. 2d 1001 (N.D. Cal. 2009) ......................................................... 34

*Mont v. Heintz,*
    849 F.2d 704 (2d Cir. 1988)......................................................................... 40

*Morris v. Khadr,*
    415 F. Supp. 2d 1323 (D. Utah 2006)............................................................ 11

*Morrison v. Amway Corp.,*
    323 F.3d 920 (11th Cir. 2003) .................................................................... 40

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010)..................................... 13

*Mwani v. Osama Bin Laden,*
    417 F.3d 1 (D.C. Cir. 2005) .................................................................... 36, 37

*Novak-Canzeri v. Turki Bin Abdul Aziz Al Saud,*
    864 F. Supp. 203 (D.D.C. 1994) .................................................................. 6

*Oparaugo v. Watts,*
    884 A.2d 63 (D.C. 2005) ...................................................................... 44, 45

*Oveissi v. Islamic Republic of Iran*,
573 F.3d 835 (D.C. Cir. 2009) ........................................................... 44

*Palestine Information Office v. Shultz*,
674 F. Supp. 910 (D.D.C. 1987) ........................................................ 25

*Palestine Information Office v. Shultz*,
853 F.2d 932 (D.C. Cir. 1988) ........................................................... 25

*Parker v. D.C.*,
850 F.2d 708 (D.C. Cir. 1988) ........................................................... 18

*Patteson v. AstraZeneca, LP*,
876 F. Supp. 2d 27 (D.D.C. 2012) ..................................................... 43

* *Price v. Socialist People's Libyan Arab Jamahiriya*,
294 F.3d 82 (D.C. Cir. 2002) ...................................................... passim

*Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*,
59 F. Supp. 2d 310 (D.P.R. 1999) ...................................................... 26

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp.2d 54 (D.D.C. 2003) ......................................... 22, 23, 30

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ................................................................ 20

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ........................................................... 40

*Sisso v. Islamic Republic of Iran*,
448 F. Supp. 2d 76 (D.D.C. 2006) ........................................ 38, 39, 41

* *Sokolow v. Palestinian Liberation Org.*,
No. 04-cv-397-GBD, 2011 WL 1345086, at *3 (S.D.N.Y. March 30,
2011) ................................................................................ 32, 33, 34

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .......................................................................... 23

*St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ................................................................... 17, 18

*Steinberg v. Int'l Criminal Police Org.*,
672 F.2d 927 (D.C. Cir. 1981) ........................................................... 28

*Strauss v. Credit Lyonnais*,
   249 F.R.D. 429 (E.D.N.Y. 2008) ............................................................. 31

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ................................................................................. 43

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) .................................................................... 39

*United States v. N. Carolina*,
   180 F.3d 574 (4th Cir. 1999) .................................................................. 40

*United States v. Yousef*,
   327 F.3d 56 (2d Cir. 2003) ...................................................................... 37

*Virgin Islands v. Miller*,
   2010 WL 1790213 (V.I. Super. May 4, 2010) ....................................... 26

*Walden v. Fiore*,
   134 S. Ct. 1115 (2014) ................................................................. 35, 36, 37

*Ward v. District of Columbia*,
   494 A.2d 666 (1985) ..................................................................... 42, 43, 44

*Water Works & Sewer Bd. v. U.S. Dept. of Army, Corps of Engineers*,
   983 F.Supp. 1052 (N.D.Ala. 1997) ........................................................ 26

*Weiss v. Nat'l Westminster Bank*,
   242 F.R.D. 33 (E.D.N.Y. 2007) .............................................................. 31

*World-Wide Volkswagen v. Woodson*,
   444 U.S. 286 (1980) ................................................................................. 28

*Wultz v. Bank of China*,
   910 F. Supp. 2d 548 (S.D.N.Y. 2012) .................................................... 31

*\* Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) ...................................................... passim

**Federal Statutes**

Wright & Miller, *Federal Practice and Procedure* § 1068.1 (3d ed.)........................................ 28

**Statutes**

18 U.S.C. § 2331 ............................................................................................ 7, 8, 39

18 U.S.C. § 2333 ...................................................................................... 6, 10, 11, 16

18 U.S.C. § 2334 ............................................................................................... 41

28 U.S.C. § 1391 ............................................................................................... 41

28 U.S.C. §§ 1602-1611 ..................................................................................... 23

42 U.S.C. § 1983 ....................................................................................... 16, 17, 18

D.C. Code § 12-302 ........................................................................................... 44

**Rules**

Fed. R. Civ. P. 4 ......................................................................................... 21, 40, 41

**Other Authorities**

*Black's Law Dictionary* (7th ed. 1999) ............................................................. 12

Restatement (Second) of Agency § 219 .............................................................. 15

Restatement (Second) of Agency § 228 .............................................................. 15

Restatement (Second) of Torts § 46(1) .............................................................. 12

## INTRODUCTION

Plaintiffs Rivka Livnat, individually and as personal representative for the Estate of Ben-Yosef Livnat, Noam Livnat, Shira Livnat, individually and as the natural guardian of minor plaintiffs A.L., B.L., N.L., O.L., Yehuda Livnat, Rachel Luz, Odeya Gordon, Navah Alfasi, and Ora Binyamin hereby oppose Defendant The Palestinian Authority's Motion to Dismiss. Plaintiffs' allegations state viable claims for relief arising out of the April 24, 2011 murder of Ben-Yosef Livnat in a terrorist machine-gun attack. Furthermore, because this Court may exercise personal jurisdiction over the Palestinian Authority, venue in the District of Columbia is proper, and service has been effected correctly, the PA's motion must be denied.

## STATEMENT OF FACTS

Ben-Yosef Livnat ("Benyo Livnat") was the father of four young children when Palestinian security officers brutally murdered him, in the presence of his brother Yehuda Livnat, at the holy site of Joseph's Tomb, near the West Bank city of Nablus, on April 24, 2011. Complaint (DE 1) ("Compl.") ¶¶ 1, 5. The security personnel who fired their automatic weapons at Benyo Livnat and his companions as they were attempting to leave the site were officers and agents of Defendant Palestinian Authority. Compl. ¶¶ 1, 18-19.

## I.     THE PALESTINIAN AUTHORITY AND ITS POLICY AND PRACTICE OF INCITING AND REWARDING ACTS OF TERROR

The Palestinian Authority (a/k/a The Palestinian Interim Self-Government Authority) (the "PA") is a non-sovereign government that provided certain governmental services in parts of the West Bank. Compl. ¶ 7. In addition to providing these governmental services, the PA administered a policy and practice of encouraging and rewarding acts of violence and terror against Israelis and Jews—acts such as the April 24 machine-gun attack. Compl. ¶ 40. In furtherance of this policy and practice, the PA worked to increase the number of convicted

terrorists in its security forces and to enhance their authority within the forces by granting

officers incarcerated for terrorist activities financial benefits and seniority and promoting them to

supervisory positions following their release.  Compl. ¶ 41.

The PA has also used its government funds to incite and reward terror by paying the

families of those who died or were imprisoned for their role in terror attacks against Israelis and

Jews, regardless of these families' financial resources.  Compl. ¶¶ 42, 44.  The World Bank has

noted that these terrorism funds are not social welfare programs; rather, as a former director of

one these funds has testified, they are intended to reward "martyrs."  Compl. ¶ 44.  Many of

these "martyrs" have orchestrated and executed terrorist attacks that have murdered and injured

U.S. citizens, as well as Israelis.  Compl. ¶ 44.

The PA routinely wields its governmental authority to publicly honor and glorify

terrorists while demonizing, and inciting violence against, Israelis and Jews.  Compl. ¶¶ 45-46.

Just one month before the April 24, 2011 terror attack, the PA named a public square in

Ramallah after Dalal Mughrabi, the terrorist behind a bus hijacking that murdered 37 civilians,

including young children.  Compl. ¶ 45.  This was not an isolated incident.  The PA named and

dedicated at least two other programs and landmarks after Palestinian terrorists in the spring and

summer of 2011.  Compl. ¶ 45.  The PA has coupled this public honoring of terrorists with a

targeted campaign of using government-published textbooks, government-operated television

and radio stations and newspapers, and appearances by high level PA officials in other media

outlets to spread anti-Israel and anti-Semitic messages.  Compl. ¶ 46.  These messages do not

reflect mere political disagreement; they disparage Jews and Israelis based on their ethnicity and

citizenship.  Compl. ¶ 46.

## II.     MOHAMMED SAABNEH: PA SECURITY OFFICER AND TERRORIST

One of the beneficiaries of the PA's policy and practice of rewarding terrorists and actively recruiting them for supervisory positions within its security forces was Mohammed Saabneh.  Compl. ¶¶ 25-36.  Hired by the PA in 2004, Mr. Saabneh pled guilty in 2005 to supplying bomb-making components to two different terrorist organizations designated by the United States as "Foreign Terrorist Organizations" and "Specially Designated Global Terrorists": Palestine Islamic Jihad and the al-Aqsa Martyrs' Brigades.  Compl. ¶¶ 26-27.  Following his guilty plea, an Israeli court sentenced Saabneh to 20 months in prison.  Compl. ¶ 27. While Saabneh served his prison sentence, the PA continued to employ him in its security forces and provide him and his family with financial benefits.  Compl. ¶ 28.  At the conclusion of Saabneh's prison term in December 2006, he immediately returned to active service in the PA's security forces.  Compl. ¶ 29.  Saabneh also quickly returned to his terrorist activities.  Compl. ¶ 30.

Four months following Saabneh's release from prison, Israeli authorities again arrested him for his involvement with terrorist organizations.  Compl. ¶ 30.  An Israeli court determined that Saabneh had again engaged in "activity that endangers the security of the region and the public security" and ordered his detention until September 2007.  Compl. ¶ 30.  In denying Saabneh's appeal, an appellate court agreed that Saabneh showed "great determination to engage in unlawful actions" and that he presented a "great danger."  Compl. ¶ 31.  Because of Saabneh's extensive ties to known terrorist groups and his quick return to terrorist activities following his previous period of incarceration, Israeli courts extended the length of his detention until July 2008.  Compl. ¶ 31.  Although the PA knew about Saabneh's extended detention and the reasons for it, the PA continued to employ and pay Saabneh throughout this entire second period of incarceration for terrorism. Compl. ¶¶ 31-32.  Upon Saabneh's release in July 2008, the PA welcomed him back to active duty within its security forces with open arms and rewarded him

3

with a promotion.  Compl. ¶¶ 33-34.  Although Saabneh had only served in active duty outside

of prison for three-and-a-half years, the PA calculated his seniority to include his period of

detention and promoted him to the rank of sergeant.  Compl. ¶ 34.  Thus, the PA rewarded

Saabneh for spending nearly as much time serving sentences related to assisting terrorist groups

as he had on active duty with the security forces.

### III.     THE PA SELECTS SAABNEH TO LEAD THE SECURITY FORCES AT JOSEPH'S TOMB: AN IMPORTANT JEWISH HOLY SITE AND DESTINATION

Joseph's Tomb, near the West Bank city of Nablus, is a Jewish holy site that is regularly

visited by Jews. Compl. ¶¶ 1, 37.  Because of its religious significance to Jews and its location

within PA-controlled territory, Joseph's Tomb is one of the few locations in the entire West

Bank where PA security officers routinely and predictably come into contact with Israeli and

Jewish civilians.  Compl. ¶ 37.  As such, Joseph's Tomb is a uniquely sensitive and potentially

volatile location and an extremely dangerous place to post an armed security officer with a

history of anti-Israel terrorist activity.  Compl. ¶ 37.  Yet the PA, after promoting Saabneh to the

rank of sergeant, armed him with an automatic weapon, stationed him at Joseph's Tomb, and

placed at least three other security officers under his command.  Compl. ¶ 35-36.  Although most

PA security officers serve exclusively within Palestinian cities and villages, where they have

minimal contact with Jews, the PA chose to place Saabneh in an area where he was guaranteed to

encounter the very people he had worked to kill and injure through his previous terrorist

activities: Jews.  Compl. ¶¶ 36-37.

### IV.     THE APRIL 24, 2011 TERRORIST ATTACK

Early on the morning of April 24, 2011, during the Jewish holiday of Passover, Benyo

and Yehuda Livnat, along with fifteen other Jewish worshippers, visited Joseph's Tomb to pray.

Compl. ¶ 15.  Neither Benyo Livnat, nor Yedua Livnat, nor any of the other worshippers were

4

armed.  Compl. ¶ 15.  Yehuda Livnat and another man waited in the vehicles while Benyo Livnat and the other worshippers entered the building that houses Joseph's Tomb.  Compl. ¶ 16.

Seconds after the worshippers entered the building, without warning or provocation, PA security forces led by Saabneh began firing their automatic weapons.  Compl. ¶ 17.  Upon hearing the gunfire, Benyo Livnat and the other worshippers immediately raced out of the tomb, ran to their vehicles, and attempted to drive off.  Compl. ¶ 18.  As the vehicles were attempting to leave, Saabneh announced to the other PA security personnel that he intended to fire at the vehicles with the intention of causing death.  Compl. ¶ 19.  Shouting "*Allahu Akbar!*" ("God is great" in Arabic), he and his subordinate security officers, Salah Hamed and Noaf Wael, began firing their automatic weapons at the worshippers' vehicles at close range.  Compl. ¶¶ 19-20.  Bullets from Saabneh and Hamed's weapons struck one car of worshippers, wounding three men, and bullets from Wael's weapon struck another car, penetrating the windshield and striking Benyo Livnat in the neck.  Compl. ¶ 19-20.

As Benyo Livnat was shot in the neck, his brother Yehuda Livnat was seated next to him and attempted to reduce Benyo Livnat's bleeding as the car raced to the infirmary.  Compl. ¶ 21.  But Benyo Livnat could not be saved and Yehuda Livnat bore personal witness to his brother's suffering and eventual death.  Compl. ¶ 22.  Within his immediate family, Benyo Livnat left behind both of his parents, his five siblings, his wife, and their four young children, all of whom have been emotionally devastated and continue to struggle with their deep grief and loss. Compl. ¶ 23.

Immediately following the attack, after the Jewish worshippers had left the site, Saabneh ordered his subordinates to cleanse the crime scene of evidence of the shooting, which they did by replacing the spent shell casing with rocks.  Compl. ¶ 24.  This manipulation of the evidence

was done to obstruct future investigations into the event and its perpetrators and make it appear

as if the PA security forces had been provoked by rock-throwing Jewish worshippers.  Compl. ¶

24.

**ARGUMENT**

To survive a motion to dismiss, Plaintiffs must make a prima facie showing of their case.

The "Court must accept the Plaintiff[s'] claims as true," *Novak-Canzeri v. Turki Bin Abdul Aziz*

*Al Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994), and resolve any factual disputes regarding

personal jurisdiction in favor of Plaintiffs, *Crane v. New York Zoological Soc'y*, 894 F.2d 454,

456 (D.C. Cir. 1990).

### I.     THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS UNDER THE ANTI-TERRORISM ACT.

Counts One and Two of Plaintiffs' complaint set forth claims for relief under the federal

Anti-terrorism Act ("ATA"), 18 U.S.C. § 2333, Compl. ¶¶ 50-62, which are fully supported and

more than sufficiently pleaded.

### A.     Plaintiffs have adequately pleaded an act of international terrorism.

This case arises out of a murderous terrorist attack targeting 17 civilian worshippers at

Joseph's Tomb, which resulted in the death of Benyo Livnat, a young man who was a husband,

father, son, and brother to Plaintiffs.  Defendant PA argues that the complaint fails to allege an

act of "international terrorism" under the ATA because it does "not give rise to a plausible

inference that Livnat's death happened in furtherance" of any of the three "objectives" required

under the statute.  Defendant's Memorandum (DE 13-1) ("Def. Mem.") at 27-28.  Yet the April

2011 machine gun attack and the PA's conduct in facilitating and encouraging such attacks

easily meet the ATA's definition of "international terrorism."

The ATA defines "international terrorism" as follows:

(1) the term "international terrorism" means activities that—

    (A)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

    (B)    appear to be intended—

        (i)  to intimidate or coerce a civilian population;

        (ii)  to influence the policy of a government by intimidation or coercion; *or*

        (iii)  to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

    (C)    occur primarily outside the territorial jurisdiction of the United States . . . .

18 U.S.C. § 2331(1) (emphasis added).

For purposes of Plaintiffs' complaint, therefore, an of act of international terrorism under the ATA is properly pleaded if it was alleged to be (A) a "violent" or "dangerous" act that would violate U.S. or state law, that (B) appears to have been intended to "intimidate or coerce" civilians or "influence" government policy, and (C) occurred outside of the United States. Defendant PA challenges only the first two elements, arguing that its conduct was not violent or dangerous to human life and that there are no allegations that the PA planned the shooting or acted with the intent to intimidate or coerce civilians or influence government policy. Def. Mem. at 28-29. The PA is incorrect in both assertions.

First, the complaint clearly alleges that the underlying conduct, the machine gun attack, "was dangerous to human life (and, indeed, took the life of Benyo Livnat)." Compl. ¶ 51(a). Patently, a machine gun attack on unarmed civilians is "dangerous" to human life, and other than its conclusory statements to the contrary, the PA does not attempt to explain how it could be otherwise. The complaint further alleges that the PA's conduct in "[e]mploying and arming Saabneh and the other security personnel at Joseph's Tomb on April 24, 2011," "[r]etaining, promoting and arming a convicted terrorist and selecting him to lead security personnel in one of

the few locations where he was virtually certain to encounter Israelis and Jews," and "[e]ngaging in a policy and practice that incited, encouraged, and rewarded acts of terrorism against Israelis and Jews" constituted "reckless endangerment," in violation of the criminal law of 34 states, and "manslaughter (including involuntary or second-degree manslaughter) or negligent or reckless homicide," in violation of federal criminal law and the laws of 49 states and the District of Columbia.  Compl. ¶¶ 51(a)(i-ii), 53(a)-(c).  By definition, reckless endangerment, manslaughter, and homicide all involve conduct that is dangerous to human life.  The PA may contest its level of culpability for the shooting attack, but it cannot seriously contend that its alleged conduct — recklessly arming a convicted terrorist with a machine gun at a Jewish holy site and selecting him to lead other security personnel — did not endanger human life. [1]

Second, although the PA argues that Plaintiffs do not allege that the PA "planned the shooting or acted with the requisite intent to intimidate or coerce a civilian population or influence the policy of a government," Def. Mem. at 28, the ATA's definition of "international terrorism" requires only the appearance of intent.  *See* 18 U.S.C. § 2331(1)(B).  Under the plain language of § 2331(1)(B), actual subjective intent need not be established, and plaintiffs must only allege that defendants' actions objectively appear to be intended to intimidate or coerce. *See Boim*, 549 F.3d at 694 (the ATA does not impose a subjective "state-of-mind requirement" and requires only an objective "external appearance rather than subjective intent).

In *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010), for example, this Court noted that although "it does seem remarkable that [defendant]—an internationally respected financial institution with branches in this country—would actually intend to facilitate

---

[1] *See Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 690 (7th Cir. 2008) ("[G]iving a loaded gun to a child (which … is not a violent act), is an "act dangerous to human life."").

the terroristic murder of American civilians by [a terrorist organization] . . . actual subjective intent is not what the ATA is concerned with."  The Court observed that the law instead "requires only that a defendant's acts '*appear* to be intended' to achieve one of the three enumerated items."  *Wultz*, 755 F. Supp. 2d at 49 (emphasis in original).   Thus, the Court held that the plaintiffs had satisfied the "objective intent standard" by alleging that the defendant knowingly executed wire transfers for a terrorist organization.  *Id.*

If executing wire transfers for a terrorist organization is sufficient to meet the definition of "international terrorism" under the ATA, then Plaintiffs' allegations that the PA knowingly armed a twice-convicted terrorist with an automatic weapon, chose him to lead other security officers, and placed him in one of the few areas where he was likely to encounter Israelis and Jews, should more than suffice.  Compl.  ¶¶ 21- 35.  Moreover, Plaintiffs have alleged that the PA had a policy and practice of inciting and encouraging terrorism against Jewish and Israeli civilians that included rewarding acts of terrorism through financial benefits and, for security officers, increased seniority, honoring and glorifying terrorists by naming landmarks and events after them, and using its educational system and government-operated media to demonize and incite violence against Israelis and Jews.  Compl.  ¶¶ 36-42.  Plaintiffs allege that the PA even ratified the terrorist attack by publicly blaming the unarmed victims for being murdered, injured, and shot at while fleeing the security officers' gunfire.  Compl. ¶¶ 43-45.  These allegations are more than sufficient to establish the objective appearance of intent required under the ATA.  Accordingly, Plaintiffs have adequately pleaded that the PA's conduct in facilitating and encouraging the April 2011 machine-gun attack, and the execution of that attack by the PA's employees and agents, constitutes "international terrorism" under the ATA.

**B.     Plaintiffs who are U.S. nationals have alleged a cognizable injury.**

Plaintiffs Rivka Livnat, Yehuda Livnat, Rachel Luz, Odeya Gordon, and Navah Alfasi, all U.S. nationals, have alleged a cognizable injury under the ATA.  A U.S. national has a valid cause of action under the ATA as long as he has suffered an injury to his "person, property or business" because of an act of international terrorism.  18 U.S.C. § 2333(a).  Rivka Livnat, Yehuda Livnat, Rachel Luz, Odeya Gordon, and Navah Alfasi have alleged emotional injuries to their person resulting from the death of their son and brother, Benyo Livnat, in the April 2011 terrorist attack.  Compl. ¶ 52(a)-(e).  In addition, because he was in the car with his brother Benyo Livnat as they were shot at by PA security forces, Yehuda Livnat suffers from emotional injuries related to the assault he experienced, in addition to his injuries stemming from the loss of his brother.  Compl. ¶ 52(a).  Therefore, Rivka Livnat, Yehuda Livnat, Rachel Luz, Odeya Gordon, and Navah Alfasi have all alleged cognizable injuries under the ATA.

Defendant PA argues that because these U.S. nationals did not witness the attack[2] and because their injuries are nonphysical, they do not have cognizable injuries.  Courts that have considered these issues have unanimously held to the contrary, concluding that the ATA's clear statutory language does not limit the pool of eligible plaintiffs by imposing the additional requirements that the U.S. national suffer a physical, rather than emotional, injury to his person and that he be present during the act of terrorism.

In *Biton v. Palestinian Authority*, for example, this Court upheld ATA claims brought by the American wife of an Israeli citizen who was murdered in a terrorist attack in the Gaza Strip.  310 F. Supp. 2d 172, 181-82 (D.D.C. 2004).  The Honorable Rosemary M. Collyer of this

---

[2] Although the PA groups Yehuda Livnat with his other family members in discussing injuries, in fact Yehuda Livnat was with his brother Benyo during the attack and suffered an assault directed at his person.  Compl. ¶¶ 21-22, 52(a).

10

Court held that even though the plaintiff had not witnessed the attack or suffered physical

harm as a result of it, she had a cognizable injury under the ATA because:

> The statute does not specifically require that a plaintiff suffer *physical* harm prior
> to filing suit.  Moreover, the term "personal injury" means "[a]ny invasion of a
> personal right, including mental suffering and false imprisonment." . . . These
> injuries are cognizable under the plain language, as well as the common-sense
> interpretation, of the ATA.

*Id*. at 182 (emphasis in original).

Every other court that has analyzed this question has followed this Court's lead in *Biton*.

*See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 426 (E.D.N.Y. 2009) (reasoning that because

"[t]he history and structure of the [ATA] suggest that Congress intended to include non-physical

injuries in the phrase 'injured in [their] person,'" plaintiffs could recover for nonphysical injuries

relating to the death of their family member in a terrorist attack); *Morris v. Khadr*, 415 F. Supp.

2d 1323, 1338-39 (D. Utah 2006) (explaining that family members of a terror victim could state

a claim for nonphysical injuries suffered as a result of a family member dying in a terrorist

attack because "Congress intended for the ATA to have a broad scope");  *Linde v. Arab Bank,*

*PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (reasoning that "[i]n the absence of any

limiting language in the statute, the court will not limit the scope of Section 2333(a) to

physical injuries to U.S. nationals" and therefore holding that U.S. nationals could bring

claims under the ATA for emotional injuries resulting from the deaths of their non-U.S.

national family members in acts of international terrorism).

Left without any supporting case law, the PA baldly dismisses these decisions as wrong,

arguing that every court that has decided the issue has "erroneously conflated" the language of the

ATA with the phrase "personal injury," which "has a distinct meaning in the law."  Def. Mem. at

24.  The PA declines to explain why this difference in phrasing constitutes a difference of

substance.[3]  Furthermore, the PA's interpretation of the ATA as excluding claims based solely on emotional harm would defy common sense and lead to absurd results.  As this Court observed in *Biton*, a plaintiff could recover for the loss of a car or "for the value of the cash in her husband's pockets that was incinerated" in a terrorist bombing, but not for the "emotional trauma and a loss of companionship from the death of a spouse occurring in the same attack."  310 F. Supp. 2d at 182, 182 n.12 (internal quotation marks and alteration omitted).  As the Court asked rhetorically, "[w]hich would you rather lose, a car or a spouse?"  *Id.* at 182.

The PA further attempts to obfuscate the clear language of the statute and holdings of the relevant case law by setting forth a long analysis of standing and tort law, arguing that plaintiffs must be present at the scene of the attack to recover for injuries to the person.  Def. Mem. 25-27.  Yet this argument has also been repeatedly rejected in terrorism cases applying traditional tort principles.  For example, in *Anderson*, the parents and one sibling of U.S. servicemen killed in the 1983 bombing of the U.S. marine barracks in Beirut brought suit against various defendants, including Iran, for emotional distress under the Foreign Sovereign Immunities Act.  *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68, 86 (D.D.C. 2010).  There, this Court discussed the presence requirement for emotional distress and stated the general rule: "The scope of recovery under this theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time."  *Id.* (citing Restatement (Second) of Torts § 46(1)).

The plaintiffs, who were parents and siblings of the victims, qualified as "immediate family."  *Id.*  The Court discussed the presence requirement as follows:

---

[3] Indeed, as noted by the *Biton* court, *Black's Law Dictionary* defines "personal injury" to include "mental suffering."  310 F. Supp. 2d at 182 (quoting *Black's Law Dictionary* (7th ed. 1999)).

The issue of presence, however, warrants a bit more discussion. Plainly, none of the plaintiffs in this action were present in Beirut and witnesses to the bombing of the U.S. Marine barracks. However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability. . . . Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims. . . . All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror.

*Id*. at 86-87 (citations and internal quotations omitted).  The Court concluded that "the Beirut bombing qualified as an extreme and outrageous act sufficient to invoke this theory of recovery for non-present plaintiffs." *Id*. at 87.[4]

Moreover, Plaintiffs' claims here are brought under the ATA. The case law under the ATA has made it clear that the ATA was intended "to codify general common law tort principles and to extend civil liability for acts of international terrorism to the *full reaches* of traditional tort law." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (emphasis added). Cases under the ATA have routinely allowed claims of emotional distress by family members who were not present at the terrorist attack. *See, e.g.*, *Lelchook v. Commerzbank,* 10 Civ. 5795(AKH), 2011 WL 4087448, at *2 (S.D.N.Y. August 2, 2011) (on a motion to dismiss, upholding claims for solatium damages by children, mother, and sibling of terror victim); *Goldberg*, 660 F. Supp. 2d at 426; *Knox v. The Palestine Liberation Organization*, 442 F. Supp. 2d 62, 80 (S.D.N.Y. 2006) (awarding mental anguish damages to family members of terror victim, including common law wife, stepchildren, parents and adult siblings); *Biton*, 310

---

[4] *Accord Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 76 (D.D.C. 2010) (holding that non-present parents and siblings could recover for emotional distress and stating "[o]ne therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 57 (D.D.C. 2006) (dispensing with the traditional "presence" requirement and noting that, under Virginia law, a parent is not required to be present for outrageous conduct to recover for emotional distress).

F. Supp. 2d at 181-82; *Estates of Ungar v. The Palestinian Authority*, 304 F. Supp. 2d 232, 276-77 (D.R.I. 2004) (providing mental anguish damages to victim's family members, including parents and adult siblings).  Accordingly, Plaintiffs Rivka Livnat, Yehuda Livnat, Rachel Luz, Odeya Gordon, and Navah Alfasi have all alleged cognizable injuries under the ATA.

### C.      The PA is vicariously liable for the acts of Saabneh and the security officers under his command.

Because, as alleged in Plaintiffs' complaint, "Saabneh and the other PA security personnel under his command carried out the shooting attack while on duty working for the PA, at the post to which they were assigned by the PA, using weapons provided by the PA, and consistent with and in furtherance of the PA's goals and policies," Saabneh and the security personnel he led carried out the shooting within the scope of their employment by the PA, thus rendering the PA vicariously liable for the terrorist attack under *respondeat superior* principles. Compl. ¶ 54.  Yet the PA argues that: (1) there is no vicarious liability under the ATA; (2) that because the PA is a foreign government, any imposition of vicarious liability must comport with *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978); and (3) Plaintiffs have failed to allege a custom, policy, or practice sufficient to impose liability under *Monell*.  Each of these arguments is wrong.

### 1.      The PA is vicariously liable for the conduct of its employees.

Vicarious liability, pursuant to principles of *respondeat superior*, is cognizable under the ATA.  As the Seventh Circuit has noted (and as the PA concedes in its memorandum in support of its Motion to Dismiss), the ATA was intended "to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law."  *Boim*, 291 F.3d at 1010; *see* Def. Mem. 25 n.8 (citing this portion of *Boim* in agreement).  Under "common law tort principles," an employer is liable for the torts of its

employees committed in the scope of the employees' employment or, if they were not committed

in the scope of employment, if the employer "intended the conduct or the consequences" or was

"negligent or reckless."  Restatement (Second) of Agency § 219.  An employee's conduct is

within the scope of employment if:

> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1).

Here, the security officers acted in the scope of their employment when they fired at

Benyo and Yehuda Livnat: the use of force was part of the security officers' job; they fired their

weapons during work hours and at their assigned work location; firing at unarmed Jewish

worshippers was intended to serve the PA's purposes given the PA's policy and practice of

inciting terrorism, *see* Compl. ¶¶ 40-46; and because the PA armed the security officers with

automatic weapons, the PA obviously expected that the officers would use force.  Even if the

officers were not acting strictly within orders, their conduct is still imputable to the PA because,

at the very least, the PA was negligent or reckless in "[r]etaining, promoting and arming a

convicted terrorist and selecting him to lead security personnel in one of the few locations where

he was virtually certain to encounter Israelis and Jews."  Compl. ¶ 53(b).  Accordingly, whether

or not the officers acted under orders when they fired at the worshippers, the PA is vicariously

liable for their conduct under traditional principles of tort law.

Although the PA points to *Estate of Parsons v. Palestinian Authority*, 715 F. Supp. 2d 27

(D.D.C. 2010), as the only example of a court declining to assign vicarious liability to an

employer for its employees' conduct under the ATA, the D.C. Circuit later reversed part of that

decision on appeal.  *See Estate of Parsons v. Palestinian Authority*, 661 F.3d 118 (D.C. Cir.

2011).  Of the four different opinions issued by the panel and its members on appeal, only Judge

Brown's opinion reached the issue of vicarious liability.  *Id.* at 148-50 (*Brown, J., concurring in*

*part and dissenting in part*).  Judge Brown opined that "*[r]espondeat superior* liability is an

elementary principle of tort law and must therefore inform our interpretation of the federal torts

created in the Anti-Terrorism Act."  *Id.* at 148.  She concluded that "the Palestinian Authority is

liable for the acts its employees committed within the scope of their employment."  *Id.*[5]

### 2.  *Monell* has no bearing on liability under the ATA.

Implicitly recognizing that it is liable under a theory of vicarious liability, the PA

attempts to cloak itself in the protection that *Monell v. Dep't of Social Services* reserves for

municipal governments.  *Monell* holds that local governments are only liable under 42 U.S.C. §

1983 for injuries inflicted by their employees or agents when a government custom or policy

caused the injury.  436 U.S. at 694.  Yet the three primary bases of the *Monell* Court's decision

are not applicable here.

First, in *Monell* the Supreme Court relied on the specific text of § 1983, which it reasoned

"cannot be easily read to impose liability vicariously" because "the fact that Congress did

specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort

suggests that Congress did not intend § 1983 liability to attach where such causation was

absent."  *Id.* at 692.  In contrast, the ATA is entirely devoid of any such causation language.  *See*

18 U.S.C. § 2333.

---

[5] *Accord Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 558 (E.D.N.Y. 2012) (holding that "Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior*"); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 650 (S.D. Tex. 2011) (deciding that plaintiffs had sufficiently alleged a *respondeat superior* claim against an employer based the conduct of its employee under the ATA).

Second, the Court relied heavily on the legislative history of the Civil Rights Act of 1871, the precursor to § 1983, which it detailed at great length. *Monell*, 436 U.S. at 665-689. This legislative history reveals Congress's struggle with balancing civil rights with federalism concerns — a struggle that ultimately led to decisions to limit the scope of liability under § 1983. *Id.* Congress's rejection of an amendment to § 1983 that legislators believed would have imposed vicarious liability on municipal governments resonated strongly with the Court. *Id.* at 692 n.57; *see St. Louis v. Praprotnik*, 485 U.S. 112, 121-22 (1988) (explaining that "*Monell*'s rejection of *respondeat superior*, and its insistence that local governments could be held liable only for the results of unconstitutional governmental "policies," arose from the *language and history of § 1983*") (emphasis added).

The ATA, on the other hand, comes with no similar legislative history. To the contrary, the ATA's legislative history evidences Congress's intent to make the statute "powerfully broad," and to incorporate "*all* of the substantive law of the American tort law system," *Boim*, 291 F.3d at 1010 (quoting *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session, July 25, 1990, Testimony of Joseph Morris, at 136 (emphasis added), substantive law that obviously provides for vicariously liability. [6]

Finally, the *Monell* Court shared the federalism concerns of the drafters of the Civil Rights Act of 1871. *Monell*, 436 U.S. at 693. The Court noted that "creation of a federal law of *respondeat superior* would have raised all the constitutional problems associated with the obligation to keep the peace, an obligation Congress chose not to impose because it thought

---

[6] *See Lee v. City of Philadelphia,* No. 08-CV-862, 2008 WL 2697320, at *3 n.10 (E.D. Pa. July 3, 2008) ("Respondeat superior is a firmly established doctrine of federal common law applicable to wide field of anti-discriminatory statutes. The *Monell* doctrine under 42 U.S.C. § 1983 is an *exception to the rule*.") (citations omitted and emphasis added).

imposition of such an obligation unconstitutional." *Id.* Concerns about the constitutional implications of increased federal encroachment on State and local authority, however, are entirely absent in the present case. There is no constitutional principle that would be vindicated by refusing to apply the traditional vicarious liability standard to the PA under the ATA. Accordingly, the distinct reasoning of *Monell*, based entirely on the language, legislative history, and constitutional context of § 1983, renders it inapplicable to a case under the ATA.[7]

       3.      Plaintiffs' allegations establish the PA's liability under the *Monell* standard.

Assuming for the sake of argument that Plaintiffs must establish, pursuant to *Monell*, that the PA caused Plaintiffs' injuries because of a custom, policy, or practice, Plaintiffs' allegations easily meet this standard. Defendant misleadingly represents that the only way to prove a custom, policy, or practice is through formal decision-making channels (*i.e.*, "ordinances, regulations, or decisions officially promulgated by the PA that created an official PA policy leading to Livnat's shooting"). Def. Mem. at 34. There are many ways to establish a custom, policy, or practice, however, including through proof of an express policy, a widespread practice, a systematic failure to adequately train, discipline, or supervise subordinates, ratification of an employee's actions, or a policy of deliberate indifference or knowing inaction.[8]

Plaintiffs have adequately alleged that the PA has a custom, policy, or practice of inciting and encouraging acts of violence and terror against Israelis and Jews that directly

---

[7] It is revealing that although the PA was also the defendant-employer in *Estate of Parsons v. Palestinian Authority*, Judge Brown did not apply nor even discuss *Monell* in analyzing the PA's liability for the conduct of its employee. *See* 661 F.3d at 148 (*Brown, J., concurring in part and dissenting in part*). Instead, as discussed above, she applied traditional tort law principles of vicarious liability. *See id.* Plaintiffs in the present case state a claim against the PA based on those traditional principles as well.

[8] *See, e.g.*, *Praprotnik*, 485 U.S. at 127; *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011); *Parker v. D.C.*, 850 F.2d 708, 712 (D.C. Cir. 1988); *Miller v. County of Nassau*, 467 F. Supp. 2d 308, 313 (E.D.N.Y. 2006).

contributed to the April 24, 2011 shooting attack.  Compl. ¶¶ 40-46.  One aspect of this custom, policy, or practice is the PA's systematic work "to increase the number of convicted terrorists in its security forces and to promote these terrorists to positions of power" by continuing to employ, pay, and calculate seniority for security personnel imprisoned for terrorist activities.  Compl. ¶ 41.  Indeed, the PA's decision to employ, promote, and select Saabneh, a twice-convicted terrorist, to lead the security officers at Joseph's Tomb on April 24, 2011 is completely consistent with this widespread practice.[9]

Another PA practice that encourages terrorism is its open and routine payments to families of deceased or incarcerated terrorists.  Compl. ¶ 42.  Although the PA describes these payments as part of the PA's "social welfare system," Def. Mem. at 35, the World Bank has pointed out that this payment program "is clearly not targeted to the poorest households" and that the amount of money devoted to these payments "does not seem justified from a welfare or fiscal perspective."  Compl. ¶ 44.  By directing scarce resources to family members of terrorists who have died while executing terrorist attacks against Israelis and Jews, the PA sends an unmistakable message to its subordinates that terrorism, including the April 2011 shooting of unarmed Jewish worshippers, is both encouraged and rewarded.

This message is further amplified by the PA's custom of "naming landmarks and events after Palestinian terrorists."  Compl. ¶ 45.  For example, in the days and months leading up to the April 2011 attack, the PA dedicated and named public spaces after Palestinian terrorists who had either died or were serving life sentences for acts of terrorism.  Compl. ¶ 45.  Similarly, the PA

---

[9] Incredibly, the PA argues that Saabneh's past is "irrelevant" because his subordinate's bullets, rather than the bullets fired from own gun, happened to kill Benyo Livnat.  Def. Mem. at 35.  Of course, Saabneh's convictions for "supplying bomb-making components" to, and closely associating with, well-known terrorist organizations are extremely relevant to his role as the commanding officer who personally shot at and ordered his subordinates to shoot at unarmed worshippers attempting to leave Joseph's Tomb on April 24, 2011.  Compl. ¶¶ 17, 19, 27, 30-31.

has "used its educational system and government-operated media to demonize and incite violence against Israelis and Jews" by, among other things, routinely disparaging Jews and Israelis, while glorifying and honoring convicted Palestinian terrorists, in its school textbooks, television and radio broadcasts, and in appearances in other media outlets. Compl. ¶ 46. Given these dangerous practices, it is not surprising that the PA, through its official spokesperson, ratified the April 2011 attack on Israel radio just hours after it had occurred by justifying the officers' actions. Compl. ¶¶ 47-49. Therefore, even under the (non-applicable) *Monell* standard, Plaintiffs have sufficiently alleged that the PA's custom, policy, or practice of inciting and rewarding terrorism laid the foundation for the April 24, 2011 machine gun attack that killed Benyo Livnat, assaulted his brother Yehuda Livnat, and emotionally injured his parents, siblings, wife, and children.

### D.    The PA may be held liable for aiding and abetting under the ATA.

Plaintiffs also sufficiently allege that the PA is liable for aiding and abetting the attackers under the ATA. In *Wultz v. Islamic Republic of Iran*, the Honorable Royce C. Lamberth thoroughly analyzed whether secondary liability for aiding and abetting acts of international terrorism is actionable under the ATA. 755 F. Supp. 2d at 54-67. Acknowledging the general presumption against aiding and abetting liability, the Court nonetheless held that "the presumption is overcome because Congress expressly created a private right of action under the ATA, Congress intended to incorporate common principles of tort law, and to refuse to recognize aiding-and-abetting liability would stymie Congress's intent." *Id.* at 55.[10]

Only the Second Circuit has expressly rejected secondary aiding and abetting liability under the ATA. *See Rothstein v. UBS AG*, 708 F.3d 82, 99 (2d Cir. 2013). Contrary to the PA's

---

[10] *Accord In re Chiquita Brands Int'l*, 690 F. Supp. 2d 1296, 1310-11 (S.D. Fla. March 27, 2010); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003).

argument, the Seventh Circuit in *Boim* did not actually decide whether plaintiffs may properly allege a claim for aiding and abetting liability under the ATA.  549 F.3d at 690-92.  Instead, the *Boim* court noted that traditional aiding and abetting conduct gives rise to primary liability under the ATA, rendering the debate over secondary liability academic.  *Id.* at 690 ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'").

Worse than the *Boim* court's example of "giving a loaded gun to a child," the PA in this case gave a loaded machine gun to a twice-convicted terrorist, placed him in one of the few locations where he was likely to encounter Israelis and Jews, and authorized him to direct his subordinate security officers.  Compl. ¶ 36.  Given the PA's criminally reckless (at best) and knowing conduct, it is liable, either primarily or as an aider and abettor, for the consequences of Saabneh's decision to fire and order his subordinates to fire at unarmed, fleeing civilians.

## II.    PERSONAL JURISDICTION.

Because Plaintiffs' ATA claim arises under federal law, the PA has not claimed, much less shown, that it is subject to the general jurisdiction of any state courts, and "exercising jurisdiction is consistent with the United States Constitution and laws," this Court may exercise personal jurisdiction over the PA pursuant to Fed. R. Civ. P. 4(k).  The PA disputes only that jurisdiction comports with the constitution in this case.  Def. Mem. at 4.  Yet the PA, as a foreign non-sovereign government, is not entitled to constitutional due process protection.  Even if it is, the due process analysis under the Fifth Amendment is easily satisfied.  Finally, this Court may properly assert specific personal jurisdiction over the PA given that its conduct in this case was part of a larger pattern of using terrorism to influence United States public policy and opinion.

### A.    General personal jurisdiction.

In assessing personal jurisdiction, courts analyze whether the exercise of personal jurisdiction would impair the defendant's constitutional due process rights.  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 98 (D.C. Cir. 2002).  Because the "personal jurisdiction requirement is not a structural limitation on the power of courts, . . . [t]he personal jurisdiction requirement recognizes and protects an individual liberty interest" and restricts "judicial power not as a matter of sovereignty, but as a matter of individual liberty."  *Id.* (quoting *Ins. Corp. of Ire. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)) (internal quotation marks omitted).  Because the PA, as a non-sovereign foreign government, has no due process rights, the Court may properly exercise personal jurisdiction over the PA without analyzing its contacts with the United States.  Accordingly, the Supreme Court's analysis of personal jurisdiction in *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011), based entirely on an analysis of defendants' due process rights, are not applicable to this case.

In the alternative, even if the PA is entitled to due process protections, *Daimler* and *Goodyear* do not control here and do not prevent this Court from exercising personal jurisdiction over the PA.  Under the Fifth Amendment's Due Process Clause, the PA has sufficient contacts with the United States to permit this Court to exercise personal jurisdiction.

         1.      <u>The PA does not have constitutional due process rights</u>.

                    *a.  Because the PA is a foreign government of a non-sovereign state, it has no constitutional due process rights.*

As a non-sovereign foreign government, the PA is not entitled to due process rights.  Foreign governments have no due process rights under the Constitution that would protect them from a federal court's assertion of personal jurisdiction.  *Price*, 294 F.3d at 96 ("[F]oreign states are not 'persons' protected by the Fifth Amendment."); *Pugh v. Socialist People's Libyan Arab*

*Jamahiriya*, 290 F. Supp.2d 54, 57 (D.D.C. 2003) (same), *appeal dismissed*, 112 F. App'x. 756

(D.C. Cir. 2004); *see also Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan*

*Republic*, 582 F.3d 393, 398-400 (2d Cir. 2009) (holding that because "a foreign State lies

outside the structure of the Union," it should not be conferred with rights "States of the Union do

not possess") (internal quotation marks omitted).

The PA argues that the D.C. Circuit's opinion in *Price* is inapplicable here because it

involved a foreign state subject to jurisdiction under the Foreign Sovereign Immunities Act

("FSIA"), 28 U.S.C. §§ 1602-1611, but the logic of *Price* applies with equal force to non-

sovereign foreign governments like the PA.[11]  In *Price*, the court did not look solely to the FSIA

in analyzing personal jurisdiction; instead, it considered Libya's argument that the Constitution

forbids the FSIA's grant of statutory personal jurisdiction.  *Price*, 294 F.3d at 95.  In so doing, it

held that Libya was not a "person" within the meaning of the Due Process Clause of the Fifth

Amendment.  *Id.* Thus, the FSIA's grant of personal jurisdiction over foreign states had no

bearing on the court's analysis of foreign states' entitlement to due process rights for the

purposes of challenging personal jurisdiction.

Furthermore, the basis of the *Price* court's holding is fully applicable to the present case.

In *Price*, the D.C. Circuit reasoned that because states do not enjoy due process rights under the

Constitution, *see South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), *abrogated on*

*other grounds by Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), "it would be highly

---

[11]  Although the PA is not the government of a sovereign foreign state, the PA has previously argued that it is and should be treated as such.  *See Livnat v. Palestinian Auth.*, No. 13-498, DE 6 at 17, (E.D. Va. June 5, 2013) ("The PA is the government of a State, albeit one not yet recognized by the U.S.") and ("As a state recognized by 132 other state members of the United Nations and accorded non-member observer State status in the United Nations, . . . the PA is entitled to the rules of service governing service on a foreign state.").  Thus, the PA argues that it is or is not a foreign state to suit its convenience.

incongruous to afford greater Fifth Amendment rights to foreign nations, who are entirely alien to our constitutional system, than are afforded to the states, who help to make up the very fabric of that system." 294 F.3d at 96.  The court emphasized just how "integral and active" states are to the "Constitution's infrastructure" and concluded that "[g]iven this fundamental dichotomy between the constitutional status of foreign states and States within the United States, we cannot perceive why the former should be permitted to avail themselves of the fundamental safeguards of the Due Process Clause if the latter may not." *Id.* at 96-97.  It would be no less incongruous to afford a foreign non-sovereign government like the PA greater constitutional safeguards than those afforded to the states.

The *Price* court found it "especially significant that the Constitution does not limit foreign states, as it does the States of the Union, in the power they can exert against the United States and its government." *Id.* at 97.  Similarly, the Constitution does not limit the PA's powers with respect to its relations with the United States.  Thus, the D.C. Circuit's observation that it would be "quite strange to interpret the Due Process Clause as conferring upon Libya rights and protections *against* the power of federal government," applies with equal force to the PA.  *Id.*

The *Price* court's concerns with the practical effects of granting foreign states due process rights also applies to the PA.  The D.C. Circuit noted that were foreign states afforded due process protections, they could challenge the legislative or executive decision to freeze their assets or impose economic sanctions as a deprivation of property without due process.  *Id.* at 99.  Armed with due process protections, the PA could also claim deprivation of property without due process if Congress or the President decided to reduce or end federal aid to the PA.  The same concern that the *Price* court expressed over courts having to adjudicate these types of "sensitive questions" that "could tie the hands of other branches [of government] as they sought

24

to respond to foreign policy crises" would also be problematic were the PA to be afforded due process protection. *Id.*

> b. *Courts have held that other non-sovereign governments and political entities are also not entitled to constitutional due process rights.*

The PA is not entitled to due process protections simply because it is a non-sovereign government. Courts have found that Palestinian political entities that pre-dated the formation of the PA were also not entitled to due process rights either. In *Palestine Information Office v. Shultz*, this Court first held that the PLO was an "organization representing a political entity" and the Palestine Information Office ("PIO") was a foreign mission representing the PLO in the United States. 674 F. Supp. 910, 916-17 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (D.C. Cir. 1988). The Court then found that the "PIO has no due process rights under our Constitution or Laws" because "[i]f the States of the Union have no due process rights, then a 'foreign mission' *qua* 'foreign mission] surely can have none." *Id.* at 919.[12] Similarly, in *Mendelsohn v. Meese*, the court agreed with the United States' argument that the PLO is "a foreign power with no constitutional rights." 695 F. Supp. 1474, 1480-81 (S.D.N.Y. 1988). The court explained:

> A foreign state lies outside the structure of the Union. The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system. It has never undertaken to abide by United States law or to accept the constitutional plan. No foreign entity of its nature could be expected to do so.

*Id.* at 1481 (internal quotation marks and citations omitted). The holdings of *Shultz* and *Mendelsohn* should apply to the PA as well.

Furthermore, courts regularly hold that non-sovereign governmental entities are not

---

[12] On appeal, the D.C. Circuit affirmed, holding that the appellants — a group of U.S. citizens and resident aliens — had no constitutional right "to represent the PLO." 853 F.2d at 941. It allowed that as "American citizens," appellants had limited due process rights (which were not violated), *id.* at 942, but it did not disturb this Court's holding that a foreign political entity has no constitutional rights.

entitled to due process protections.  *See City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under the Fifth Amendment's due process clause."); *Water Works & Sewer Bd. v. U.S. Dept. of Army, Corps of Engineers*, 983 F.Supp. 1052, 1063 n.7 (N.D. Ala. 1997) (holding the municipal corporation was not entitled to due process rights because it was not a "person" under the Fifth Amendment); *El Paso Cnty. Water Imp. Dist. No.1 v. Int'l Boundary and Water Comm'n*, 701 F. Supp. 121, 123-24 (W.D. Tex. 1988) (dismissing the constitutional claim brought by the El Paso County Water Improvement District Number 1, a political subdivision of the State of Texas, because the Fifth Amendment was "inapplicable" to it); *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167-68 (D.D.C. 1980) (rejecting argument that a municipality could assert due process rights under the Fifth Amendment because "a state cannot confer a constitutional status . . . which the state does not itself enjoy").

Indeed, courts have held that Puerto Rico and the Virgin Islands, which, just like the PA, are neither sovereign states nor creatures or subdivisions of the States of the Union, are not "persons" within the meaning of the Due Process clause.  *See Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (finding that agencies were "intrinsically part of the Commonwealth of Puerto Rico," and thus "non-persons" under the Fourteenth Amendment); *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) ("[T]he Government [of the Virgin Islands] is not a person for purposes of [having] due process [protections] . . . .").  There is simply no basis to find that the PA is entitled to due

process protections, when Puerto Rico and Virgin Islands are not.

Although other courts have exercised personal jurisdiction over the PA after applying a traditional due process analysis, these courts did not analyze whether the PA was entitled to due process protections, nor did they hold that the PA should be afforded due process rights. Accordingly, these decisions are inapposite to the underlying question of whether the PA is a "person" for purposes of constitutional due process. *See Price*, 294 F.3d at 96 (noting that decisions in which the Supreme Court and the D.C. Circuit assumed without deciding that foreign states were entitled to constitutional due process did not resolve the issue and that now that the issue was directly before the court, it could hold that foreign states are not protected under the Due Process Clause of the Fifth Amendment).

> 2.   *Daimler* and *Goodyear* do not prohibit the exercise of personal jurisdiction over the PA.

Even if the PA is entitled to due process protections, which it is not, *Daimler* and *Goodyear* do not control this case. *Daimler* and *Goodyear* applied the Fourteenth Amendment, not the Fifth Amendment, which imposes fewer limits on the United States than the Fourteenth Amendment imposes on the States. In addition, *Daimler* and *Goodyear* concerned a factually distinct situation from this case—international commerce, rather than international terrorism. The PA asks this Court to make new law by extending *Daimler* and *Goodyear* to a very different situation. The Court should decline this invitation.

> a.   Daimler *and* Goodyear *concerned rights arising under the Fourteenth Amendment, not the Fifth Amendment.*

*Daimler* and *Goodyear* were decided under the Fourteenth Amendment, not the Fifth

Amendment.  The latter controls here.[13]  *Daimler*, 134 S. Ct. at 751; *Goodyear*, 131 S. Ct. at

2853.  "[A]n inquiry into fairness under the Due Process Clause of the Fifth Amendment tends to

focus on the same factors considered under the minimum contacts test, but is often applied with

more flexibility than under the Fourteenth Amendment analysis."  Wright & Miller, *Federal*

*Practice and Procedure* § 1068.1 (3d ed.).

Courts apply a more expansive approach to jurisdiction under the Fifth Amendment than

under the Fourteenth because the latter "'ensure[s] that the States, through their courts, do not

reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal

system.'"  *Handley v. Ind. & Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984) (quoting

*World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-92 (1980)). [14]  As explained in Wright

& Miller:

> When a federal court adjudicates a federal question claim, it exercises the
> sovereign power of the United States and no federalism problem is presented.
> The Fourteenth Amendment function of protecting the several states' status as
> coequal sovereigns seemingly ought to be of no relevance to the parallel analysis
> under the Due Process Clause of the Fifth Amendment.

*Federal Practice and Procedure* § 1068.1.

---

[13]Although the PA does not discuss which "Due Process" Clause it invokes, it is the Fifth
Amendment that would apply, because Plaintiffs sue the PA under a federal statute, and the Due
Process Clause of the Fourteenth Amendment applies only to the states.  *See Steinberg v. Int'l
Criminal Police Org.*, 672 F.2d 927, 930 (D.C. Cir. 1981) ("In United States jurisprudence, the
outer boundaries of a court's authority to proceed against a particular person or entity is set by a
due process measure, imposed on action at the national level by the Fifth Amendment, and on
state action by the Fourteenth Amendment."); *Aucoin v. Prudential Ins. Co. of Am.*, 959 F. Supp.
2d 185, 188 (D.D.C. 2013) (analyzing personal jurisdiction under Fifth Amendment in ERISA
case); *Bally Gaming, Inc. v. Kappos*, 789 F. Supp. 2d 41, 45 (D.D.C. 2011) (applying Fifth
Amendment in patent infringement suit under federal law).

[14] *Accord Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985) (The Fourteenth
Amendment "reflects territorial limitations on the power of an individual state.  Those strictures
of [F]ourteenth [A]mendment due process analysis which attempt to prevent encroachment by
one state upon the sovereignty of another do not apply with equal force to the adjudication of a
federal claim in a federal court.").

Application of the more flexible Fifth Amendment due process analysis is particularly appropriate in the context of an ATA case, where Congress has expressed its clear intent for extraterritorial application of the statute. *Goldberg*, 660 F. Supp. 2d at 431; *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States."). Accepting the PA's invitation to apply the Fourteenth Amendment due process analysis of *Daimler* and *Goodyear* — an analysis concerned with federalism and, in those cases, the rights of foreign corporations — to this case would lead to absurd results: In effect, Congress would have granted United States nationals a right without meaning. United States nationals' ability to bring international terrorists to justice in the United States, as intended by Congress, would be completely thwarted, unless the international terrorist happened to be "at home" in the United States — an unlikely scenario. The law should be interpreted in a manner that avoids absurd results and the nullification of statutes "if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). To that end, this Court should not apply the cabined Fourteenth Amendment due process analysis of *Daimler* and *Goodyear* when the Fifth Amendment allows an approach that would honor the intent of Congress in enacting the ATA to bring international terrorists to justice in the United States.[15]

---

[15] It cannot have escaped the PA's notice that extending Fourteenth Amendment rules to cases arising under the Fifth Amendment could have grave, unintended (at least by Congress, if not the PA) consequences for other types of cases in which international terrorists are prosecuted in United States courts. Many of the terrorists on the FBI's most-wanted terrorists list, for example, committed their crimes outside the territory of the United States, but otherwise within the jurisdiction of the United States, because they hurt U.S. citizens or U.S. interests. *See* Weber Decl., Ex. 24 (FBI, *Most Wanted Terrorists*, www.fbi.gov/wanted/wanted_terrorists (last visited June 11, 2014)). None of the terrorists wanted for crimes committed abroad appears to be "at home" in the United States. If the narrower concepts embodied in the Fourteenth Amendment applied to the Fifth Amendment, these and similar prosecutions would be called into question.

In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, this Court observed that many federal criminal statutes contemplate:

> the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other "contacts" with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts.

290 F. Supp. 2d at 59.  Accordingly, to preserve the power of the ATA, and the enforceability of all other laws intended to bring international terrorists to justice, the Court should not apply the stringent Fourteenth Amendment due process analysis of *Daimler* and *Goodyear*.

    b. *The Supreme Court's reasoning in* Daimler *and* Goodyear *was shaped by the very different factual context in those cases.*

In addition to the fundamental constitutional distinctions, important factual differences separate this case from *Daimler* and *Goodyear*.  Both cases involved corporations engaged in international commerce.  *Daimler*, 134 S. Ct. at 750-51; *Goodyear*, 131 S. Ct. at 2850.  This was particularly important to the *Daimler* Court, which wanted to ensure "greater predictability" in suits against "corporations" through "[s]imple jurisdictional rules."  *Daimler*, 134 S. Ct. at 760 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)).  The Supreme Court was concerned about corporations being subject to personal jurisdiction in every state in which their "sales are sizable."  *Id.* at 761.  The Court explained that other nations do not approve of general jurisdiction over "corporations" outside their "principal place of business," that "unpredictable applications of general jurisdiction based on activities of U.S. based subsidiaries could discourage foreign investors," and that such differences between United States and foreign law had led to "international friction."  *Id.* at 762-63.

This reasoning has no place in deciding whether to exercise jurisdiction over entities

engaged in terrorism rather than commerce. *Daimler* did not seek to provide "greater

predictability" to terrorists through "simple jurisdictional rules," nor are entities accused of

terrorism concerned with discouraging foreign investors because of their activities in the United

States. The "principal place of business" analysis also does not make a great deal of sense for

typically unincorporated terrorist organizations. The concerns that arise in the context of

combatting terrorism are clearly much different from the economic concerns that arise in

defining the contours of where businesses can expect to be sued.

When a case is brought under a federal statute providing for nationwide service, "the

personal jurisdiction analysis must give appropriate consideration to the strong federal concerns

involved." *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 286

(S.D.N.Y. 2000). Here, the United States' strong interest in combatting terrorism outweighs

*Daimler*'s concerns with greater business predictability. *See Wultz v. Bank of China*, 910 F.

Supp. 2d 548, 559 (S.D.N.Y. 2012) ("When the U.S. interest in fully and fairly adjudicating

matters before its courts is combined with its interest in combating terrorism, the U.S. interest is

elevated to nearly its highest point . . . .") (internal quotation marks omitted); *In re Islamic

Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 79 (D.D.C. 2009) (noting "the federal

interest in deterring terrorist attacks and compensating victims"); *Strauss v. Credit Lyonnais*, 249

F.R.D. 429, 443 (E.D.N.Y. 2008) ("The legislative history of the ATA, Executive Orders signed

by two United States Presidents, and the participation by the United States in international

treaties and an international task force, establish this country's profound and compelling interest

in combating terrorism at every level . . . ."); *Weiss v. Nat'l Westminster Bank*, 242 F.R.D. 33, 53

(E.D.N.Y. 2007) ("[T]he United States . . . has a strong national interest in enforcing domestic and

international anti-terrorism laws.").

31

3.     The PA has sufficient contacts with the United States to permit the exercise of personal jurisdiction.

Under a Fifth Amendment due process analysis, the PA has sufficient contacts in the United States to warrant the exercise of personal jurisdiction in this case.  Every court to consider the issue, including this one, has held that the PA has constitutionally sufficient minimum contacts with the United States.  *See Sokolow v. Palestinian Liberation Org.*, No. 04-cv-397-GBD, 2011 WL 1345086, at *3 (S.D.N.Y. March 30, 2011) ("this Court agrees with every federal court to have considered the issue of the totality of activities in the United States by the PLO and the PA justifies the exercise of general personal jurisdiction") (collecting cases); *Estate of Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 113 (D.D.C. 2006); *Estates of Ungar v. Palestinian Auth.*, 325 F. Supp. 2d 15 (D.R.I. 2004) *aff'd* 402 F.3d 274 (1st Cir. 2005); *Biton*, 310 F. Supp. 2d at 172.  Moreover, the *Ungar* court conducted an extraordinarily detailed analysis of the contacts of the PA with the United States and concluded that the plaintiffs in that case demonstrated the PA's minimum contacts by a preponderance of the evidence and that the court could exercise personal jurisdiction over the PA without violating the Due Process Clause of the Fifth Amendment.  *Ungar*, 325 F. Supp. 2d at 47-59.

The PA has offered no argument that, at the time the complaint in this case was filed, the contacts discussed in, *inter alia*, *Sokolow*, *Klieman*, *Ungar* and *Biton* had in any way ceased, and it bears the burden of doing so.  *See, e.g.*, *McKesson v. Islamic Republic of Iran*, 185 F.R.D. 70, 77 n.3 (D.D.C. 1999) ("If the court accepted defendant Iran's theory, it might be forced to hold repetitive hearings regarding control every time plaintiffs sought discovery or pursued their case in any material way.  The court finds this preposterous.").  Indeed, had there been a change in the factual basis of jurisdiction established in those cases, the PA presumably would have so informed the Court.

32

Although the PA argues, as it has argued in previous cases, that it does not operate out of the PLO's Washington, D.C. office, every court to address that argument has rejected it. *Sokolow*, 2011 WL 1345086, at *3 ("[T]he weight of the evidence indicates that the D.C. office simultaneously served as an office for the PLO and the PA."); *Ungar*, 325 F. Supp. 2d at 56-58 (finding that the PA's representations to the court that it had no presence in the United States and that it did not also operate out of the PLO's Washington, D.C. office were untrue); *Biton*, 310 F. Supp. 2d at 180 (same). There is good reason for this. As explained in the declaration of Arieh Dan Spitzen, former Advisor for Palestinian Affairs and Head of the Department for Palestinian Affairs in the Israeli Defense Forces' Office of the Coordinator of Government Activities, and as demonstrated in the exhibits attached to his declaration, the employees of the Washington, D.C. office work for and provide services on behalf of the PA. Decl. of Arieh Dan Spitzen, June 12, 2014 ("Spitzen Decl.") ¶¶ 2, 4, 6-14 Exs. 2-20. Ambassador Areikat, who works out of the Washington, D.C. office, routinely speaks on behalf of the government of the Palestinian Territories, which is the PA, *not* the PLO. Spitzen Decl. ¶¶ 4, 6-7, Exs. 2-9. In addition, the Washington, D.C. office performs governmental services exclusively on behalf of the PA, not the PLO, and receives documents related to corporate and NGO registration, passport renewal, and powers of attorney for real estate transactions. Spitzen Decl. ¶ 11, Exs. 13-16.

The PA continues to undertake the same activities that formed the basis of personal jurisdiction in *Sokolow*, *Klieman*, *Ungar* and *Biton*. The PA conducts fundraising activities, employs lobbyists, and has dispatched Ambassador Maen Rashid Areikat to more than 500 speaking engagements in the United States to further its causes. Decl. of Jessica P. Weber, June 13, 2014 ("Weber Decl.") ¶¶ 6-10. Indeed, thanks to its extensive contacts, the PA has successfully secured nearly $3.4 billion in aid from the United States over the past six years.

Weber Decl., Ex. 25 at 5.  On these facts, other courts have found that sufficient minimum

contacts exist between the PA and the United States to allow for the exercise of personal

jurisdiction.  *See Sokolow*, 2011 WL 1345086, at *3; *Biton*, 310 F. Supp. 2d at 172; *Ungar*, 325

F. Supp. 2d at 15.

Contrary to the PA's argument that its contacts with the United States fall within the

government contacts exception, the overwhelming majority of the PA's activities in the United

States are not government-related.  *See* Weber Decl. ¶¶ 10-11 (demonstrating that fewer than

15% of the nearly 700 events appearing on the PLO's FARA filings involved U.S. government-

related activities).  These activities involve fundraisers, community outreach, cultural events, and

lectures.  *See id.*  Even Ambassador Areikat's declaration reveals that most of the PA's work in

the United States does not involve meeting with or petitioning government officials.  Decl. of

Ambassador Maen Areikat, May 22, 2014, ¶ 16 (included with the PA's Motion to Dismiss)

(stating that of the PA's five departments, only two deal with the executive or legislative

branches of government and within each of these departments, staff do not spend their time

exclusively meeting with or petitioning government officials, but also "track[] policy changes"

and "relevant legislation" and "communicate[] the Palestinian message to . . . interested

American constituents").

Moreover, the government contacts exception does not apply to foreigners like the PA.

*See Monster Cable v. Euroflex*, 642 F. Supp. 2d 1001, 1009 (N.D. Cal. 2009) (holding that the

government contacts exception did not apply to an Italian corporation because "First Amendment

concerns" do not apply to foreign defendants); *Ungar*, 325 F. Supp. 2d at 53 (reasoning that

because the government contacts exception "is grounded in concerns regarding the First

Amendment right to petition the federal government," its applicability to the PA "seems

questionable"); *Envtl. Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (explaining that the purpose of the government contacts exception is to provide access to the government "for the entire national citizenry").  In addition, because receiving financial aid from the United States government is not the same as petitioning the government, the significant aid the PA receives from the United States should not be excluded when considering whether the PA is subject to this Court's jurisdiction.

Likewise, the exception does not apply to contractual-commercial relationships like the one between the PA and Bell Pottinger, *see* Weber Decl. at ¶ 6, and does not apply where there are non-government contacts in addition to government contacts at issue.  *See Bechtel & Cole v. Graceland Broadcasting, Inc.*, No. 92-7190, 1994 WL 85047, at *2 (D.C. Cir. Mar. 9, 1994) (exercising personal jurisdiction over defendant because its contacts were not limited to petitioning the government, but included "a professional relationship with Bechtel, a District of Columbia law firm, to conduct its [government] business"); *see also Ungar*, 325 F. Supp. 2d at 53 (dispatching the defendants' government contacts exception argument).  Accordingly, it is clear that through these varied activities in the United States, the PA intentionally directs its efforts toward and in the United States, and "purposefully avails itself of the privilege of conducting activities" here "thus invoking the benefits and protections" of United States law. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

**B.      Specific jurisdiction.**

This Court may also exercise personal jurisdiction over the PA under a theory of specific jurisdiction.  Specific jurisdiction "encompasses cases in which the suit arises out of or relates to the defendant's contacts with the forum." *Daimler*, 134 S. Ct. at 748-49 (internal quotation marks and alterations omitted).  The specific jurisdiction inquiry "focuses on the relationship

among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121

(2014) (internal quotation marks omitted). The defendant need not be located in the forum, nor

must the wrongful act physically have taken place there. "'[S]o long as [an] actor's efforts are

'purposefully directed' towards residents of another [forum],' the Supreme Court has

'consistently rejected the notion that an absence of physical contacts can defeat personal

jurisdiction there.'" *Mwani v. Osama Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005) (quoting

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

As Plaintiffs alleged in their complaint, the April 24, 2011 terrorist attack at Joseph's

Tomb was part of the PA's policy and practice of encouraging acts of terror and using terrorism

to influence United States public opinion and policy. Compl. ¶14. Professor Jeffrey F. Addicott,

Director of the Center for Terrorism Law at St. Mary's University School of Law, has opined,

based on his extensive knowledge and experience in the area of international terrorism, that the

PA "intentionally maintains a policy of encouraging acts of terrorism against civilian Jews and

Israelis in order to influence public opinion and policy in the United States." Decl. of Jeffrey F.

Addicott, June 8, 2014 ("Addicott Decl."), ¶¶ 3-4. Specifically, Professor Addicott explains that

the PA, recognizing that the United States "places as a top priority a peaceful resolution of the

Israeli-Palestinian conflict," employs terrorism "to influence the United States to pressure Israel

for greater concessions" in peace negotiations with the PA. Addicott Decl. ¶ 4. He notes that

"[b]y keeping terrorism on the plate, the PA view is that the United States will continue to exert

greater pressure on Israel with little cost to the PA" and that without the use of terrorism, "the

emphasis forcing Israeli compromises would quickly fade." Addicott Decl. ¶ 10. Professor

Addicott's opinions are consistent with what this Court has previously observed: terrorism "has

become the insidious method by which certain rogue states operate to influence the international

community, outside the normal bounds of international communication." *Daliberti v. Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000).

The PA's conduct in facilitating, encouraging, and ratifying the April 2011 terrorist attack, therefore, was in no small part directed at influencing United States foreign policy.  And, of course, the PA was able to shape United States policy on the ground thanks to the activities of its Washington, D.C. office.  *See supra* Part II.A.3.  The PA, therefore, has purposefully directed its policy and practice of inciting terrorism towards the United States.[16]

Although the April 24, 2011 terrorist attack did not take place on United States soil, courts have exercised personal jurisdiction over defendants where the "effects" of the defendants' conduct connected them to the forum, even where the allegedly wrongful conduct occurred elsewhere.  *See Walden*, 134 S. Ct. at 1123 (citing with approval the Court's previous specific jurisdiction holding in *Calder v. Jones*, 465 U.S. 783 (1983), in which the plaintiff was permitted to sue defendant in California for publication of libelous story in Florida because the effects of the publication were felt heavily in California).

Particularly in cases involving acts of terrorism committed abroad, courts have freely exercised specific jurisdiction based on the effects of the defendant's conduct in the United States.  *See Mwani*, 417 F.3d at 13 (exercising personal jurisdiction over defendants who orchestrated a terrorist bombing in Kenya that injured only Kenyans because the bombing was one component of an ongoing conspiracy to attack the United States); *United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003) (exercising personal jurisdiction over individuals who bombed a Philippine Airlines flight en route from Manila to Japan — even though no U.S. national was injured — because it was a "test-run" in furtherance of a larger conspiracy to "inflict injury on

---

[16] Of course, the PA will be free to try to convince a jury otherwise.

[the United States] and its people and influence American foreign policy"); *Daliberti*, 97 F. Supp. 2d at 54 (finding personal jurisdiction over Iraqi defendants who kidnapped Americans in Iraq in order to prompt certain actions by the U.S. government).

Moreover, specific jurisdiction in this case may be based on the effects of the PA's conduct on citizens of the United States. Two U.S. citizens, Yitzhak and Natan Safra, were physically injured in the April 2011 attack, and Benyo Livnat's mother and four of his siblings, all of whom have suffered emotionally because of the attack, are U.S. citizens. This Court has previously held that where U.S. citizens are harmed in terrorist attacks, the perpetrators should be on notice that they can be brought to justice in a United States court. *Daliberti*, 97 F. Supp. 2d at 54 (noting that "it is reasonable that foreign states be held accountable in the courts of the United States for terrorist actions perpetrated against U.S. citizens anywhere"); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 23 (D.D.C. 1998) ("Foreign state sponsors of terrorism could not reasonably have expected that the United States would not respond to attack on its citizens, and not undertake measures to prevent similar attacks in the future."). As the *Flatow* court explained:

> As terrorism has achieved the status of almost universal condemnation, as have slavery, genocide, and piracy, and the terrorist is the modern era's *hosti humani generis* — an enemy of all mankind, this Court concludes that fair play and substantial justice is well served by the exercise of jurisdiction over foreign state sponsors of terrorism which cause personal injury to or the death of United States nationals.

*Flatow*, 999 F. Supp. at 23.

This Court's analysis in *Sisso v. Islamic Republic of Iran*, is instructive. 448 F. Supp. 2d 76, 89-90 (D.D.C. 2006). In *Sisso*, an Israeli citizen was killed in a terrorist bombing in Israel. *Id.* at 79. Her son, a United States citizen, brought an ATA claim for the emotional harm he suffered as a result of his mother's murder and alleged that, among other actors, the terrorist

group Hamas was to blame for the bombing.  *Id.*  Although the attack in that case occurred on foreign soil and took the life of a foreign citizen, this Court held that it had "no difficulty concluding that the conduct plaintiffs attribute to Hamas, if proven, was calculated to cause injury to U.S. citizens (among others) and, predictably, did just that."  *Id.* at 89.  The Court explained that:

> The ripples of harm that flow from such barbarous acts rarely stop at the banks of the Mediterranean Sea or the Jordan River, and those who engage in this kind of terrorism should hardly be surprised to find that they are called to account for it in the courts of the United States—or, for that matter, in any tribunal recognized by civilized peoples.

*Id.* at 90.[17]  Similarly, because the PA, as a sponsor of terrorism, aimed its conduct at influencing United States foreign policy and harmed United States citizens while doing so, this Court may properly exercise specific personal jurisdiction over it.

The nexus between the PA, the United States, and this lawsuit is further evidenced by the ATA claim asserted here.  An element of Plaintiffs' ATA claim is that the PA's conduct "appear[ed] to be intended . . . to influence the policy of a government by intimidation or coercion."  18 U.S.C. § 2331 (1)(B)(ii); *see* Compl. ¶ 51(c).  In their complaint, Plaintiffs have alleged that the PA's conduct was:

> intended, through intimidation and coercion, to influence the . . . United States government['s] policies regarding the right of Israelis to visit Jewish religious sites in the West Bank or to visit or live in the West Bank, as well as [the] government['s] policies regarding peace negotiations with the PA and Israel's continued presence in the West Bank.

---

[17] *Accord United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (rejecting Fifth Amendment due process challenge to prosecution of individuals who conspired to sell arms "with the understanding that they would be used to kill Americans and destroy U.S. property," because the goal "was to harm U.S. citizens and interests and to threaten the security of the United States," and the fact that the "sting operation" took place "entirely outside the United States and involv[ed] solely foreign citizens" did not violate due process because "a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests").

Compl. ¶ 51(c).

Because facts relating to the PA's efforts to influence U.S. government policy are intertwined with the merits of the case, including the statutory "apparent intent" element of Plaintiffs' ATA claims, the Seventh Amendment entitles Plaintiffs to present such facts to a jury. "When the jurisdictional facts are intertwined with the merits of plaintiffs' claims . . . a court should assume that jurisdiction exists, and then proceed to determine the merits of the claim." *Mont v. Heintz*, 849 F.2d 704, 712 (2d Cir. 1988).[18]  Therefore, if the Court finds that the facts supporting Plaintiffs' claim that the PA's conduct was directed at the United States are in dispute, it should defer ruling on specific jurisdiction pending a trial on the merits.

### III.   VENUE IS PROPER IN THE DISTRICT OF COLUMBIA AND THE PA WAS PROPERLY SERVED WITH PROCESS.

Plaintiffs served process in this action on the PA through service on Ambassador Maen Rashid Areikat at his office in Washington, D.C.  *See* DE 9.  Because, as outlined above, Mr. Areikat serves as chief representative of the PA in the United States and the head of the PA's Washington, D.C. office, he is a valid agent for service of process on the PA under Fed. R. Civ. P. 4(h); *see Ungar*, 325 F. Supp. 2d at 55-59 ("[T]he court finds the evidence overwhelming that Mr. Abdel Rahman [who previously held Areikat's position] is an agent of both the PLO and the PA and that as their Chief Representative in the United States he exercises independent judgment in the performance of his duties such that it is fair, reasonable, and just to imply his authority to accept service on behalf of both the PLO and PA."); *Biton*, 310 F. Supp. 2d at 179-80 (finding

---

[18] *Accord Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004) (holding that the district court improperly dismissed claims for lack of jurisdiction because "the jurisdictional issue and substantive issues in this case are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits"); *Morrison v. Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003) (same); *United States v. N. Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (same).

service on Abdel Rahman valid service on the PA); s*ee also Estate of Klieman v. Palestinian Auth.*, 547 F. Supp. 2d 8, 13-14 (D.D.C. 2008) (finding that service on Areikat's immediate predecessor was valid service on the PA).  Service of process on the PA has therefore been effectuated.[19]

Under the ATA, venue is proper in any district "where any defendant resides or is served."  18 U.S.C. § 2334.  Plaintiffs served the PA in the District of Columbia, rendering venue proper in this district.

### IV.     THE NEGLIGENCE CLAIMS OF ALL PLAINTIFFS AND THE BATTERY AND ASSAULT CLAIMS OF MINOR PLAINTIFFS SHOULD REMAIN IN THE CASE.

Plaintiffs' assault, battery, and negligence claims arise from the same "common nucleus of operative facts" as their ATA claim.  *See Sisso*, 448 F. Supp. 2d at 90 (internal quotation marks omitted).  Accordingly, this Court should exercise pendent personal jurisdiction over the PA with respect to these claims.  *See Wultz*, 755 F. Supp. 2d at 36.

### A.      Assault and battery.

Because criminal proceedings against the PA's officers who carried out the April 2011 shooting attack are still pending in Israel, Plaintiffs claims for assault and battery should be tolled under District of Columbia law until those proceedings have concluded.  Regardless of whether all Plaintiffs' assault and battery claims are tolled, the claims of Benyo Livnat's children, A.L., B.L., N.L., O.L., all of whom are under the age of eighteen, are timely.

---

[19] Plaintiffs are also in the process of trying to serve the PA at its Ramallah headquarters pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters and Fed. R. Civ. P. 4(f)(2)(C).  Weber Decl. ¶ 14. Plaintiffs will file proof of one or both of these two methods of service with the Court as soon as they are obtained.  *Id.*  Once these modes of international service are effectuated, service will be proper in this case regardless of whether Mr. Areikat serves as an agent of the PA.  Venue will also be proper pursuant to 28 U.S.C. § 1391(b)(3) because the PA, as discussed above, is subject to this Court's personal jurisdiction.

Under *Ward v. District of Columbia*, Plaintiffs' assault and battery claims should be tolled pending resolution of the related criminal proceedings in Israel.  494 A.2d 666 (1985). *Ward* involved a civil forfeiture action brought against a defendant who had been convicted of violating criminal gambling laws.  *Id.* at 666-67.  The District of Columbia had filed the civil forfeiture action after the one-year statute of limitation had run, but only months following the defendant's criminal conviction.  *Id.* at 667.  Although the court found that the one-year statute of limitations applied, it held that it had been tolled during the time between the arrest and seizure of property and the "judgment in the underlying criminal prosecution."  *Id.* at 670.

The court reasoned that there are "strong public policy reasons for tolling the statute of limitations during the pendency of the criminal proceedings."  *Id.*  First, the outcome of the civil forfeiture case "may adversely affect the criminal proceedings arising from the same seizure." *Id.*  Second, tolling the civil matter preserves "scarce judicial resources" because "resolution of the criminal proceeding might very well facilitate the disposition of the [civil] action."  *Id.*  The court noted that an acquittal in the criminal proceedings could influence the decision to bring civil proceedings at all.  *Id.* at 671.  Third, because the criminal and civil proceedings are brought by different parties, imposing the one-year statute of limitations on the party bringing the civil action would not give that party "the flexibility it needs to deal with a situation over which it has no control."  *Id.*  Finally, the court reasoned that tolling the statute of limitations would be "consistent with the interests served by statutes of limitations generally," which are to prevent surprises and preserve evidence.  *Id.*  The court observed that "[b]ecause the evidence in the two proceedings is often the same, it is . . . unlikely that memories will fade and witnesses disappear while the criminal proceedings are pending."  *Id.*

The reasoning of *Ward* applies just as forcefully in the present case.  Here, Israel arrested

and initiated criminal proceedings against the officers involved in the April 2011 attack on May 22, 2013, less than a year before this case was filed in this Court. Spitzen Decl. ¶ 16. Although one officer was convicted soon after his arrest, the others are still awaiting trial. *Id.*[20] Israel has not yet arrested the two other responsible officers, including Saabneh, for prosecution.[21]

Because criminal proceedings have either not yet concluded or been initiated, it would be unfair to penalize Plaintiffs for not bringing their related battery and assault claims against the PA earlier.[22] All of the reasons for tolling cited in *Ward* apply. First, the outcome of Plaintiffs' civil case could affect the criminal proceedings against the officers. Second, the outcome of the criminal case will strongly impact the present civil case, particularly in confirming the reasons the officers opened fire on the worshippers and the absence of any provocation by the worshippers. Third, Plaintiffs have no control over Israel's prosecution of the officers; thus, it would be unfair to penalize them for waiting for the criminal proceedings to run their course. Finally, because the evidence in both the criminal and civil proceedings overlap and because the

---

[20] It is unclear whether the PA initiated any formal criminal proceedings against the perpetrators of the attack. To the extent there was a proceeding, no records of it appear to have been made public. Spitzen Decl. ¶ 15. Thus, the relevant criminal prosecution of this matter is the public, formal prosecution in Israel. If the PA contends that tolling should have occurred from the time of its prosecution of the officers, as the movant it has the burden to submit records of any alleged criminal proceedings.

[21] To the extent the facts regarding the criminal proceedings are disputed, this Court should allow those disputes to be determined by the jury. *See Patteson v. AstraZeneca, LP*, 876 F. Supp. 2d 27, 39 (D.D.C. 2012) ("Because the record raises factual disputes surrounding . . . [when the statute of limitations began to run], the Court finds that even if the continuing-treatment rule did not apply, summary judgment based on the statute of limitations would nonetheless be premature at this juncture.).

[22] Although Plaintiffs bring the present case against the PA and the criminal proceedings are brought against the PA's officers, the rationale for tolling still applies because: (1) the officers were acting within the scope of their employment as agents of the PA when they opened fire on the worshippers (*see supra* Part I.C); and (2) the PA, as the employer, and the officers, as the PA's employees, would be in privity with each other for purposes of collateral estoppel. *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008).

memories and presence of witnesses are preserved through the ongoing criminal prosecution, tolling would preserve the interests of the statute of limitations here, just as it did in *Ward*.

Regardless of the Court's decision to toll all Plaintiffs' battery and assault claims pursuant to *Ward*, the battery and assault claims of minor Plaintiffs A.L., B.L., N.L., O.L. have all been tolled from the date of the attack because they were and continue to be under the age of eighteen.  D.C. Code § 12-302 ("[W]hen a person . . . entitled to maintain an action is . . . under 18 years of age . . . at the time the right of action accrues . . . he or his proper representative may bring action within the time limited after the disability is removed.").  Accordingly, the battery and assault claims of Plaintiffs A.L., B.L., N.L., O.L. continue to be timely.

### B.   Negligence.

In determining applicable law, courts must look to the choice-of-law rules of the forum, here the District of Columbia.  *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009).  "To determine which jurisdiction's substantive law governs a dispute, District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test."  *Id.* at 842.  Courts thus look to each government's interest in having its applicable law applied, the location of where the injury occurred, where the conduct causing the injury occurred, the location or residence of the parties, and where the relationship between the parties is centered.  *Id.*  Although the April 2011 terrorist attack occurred in the West Bank, Israel has a much stronger interest in applying its law of negligence than does the PA.  The victims of the attack were all Israeli residents and Israel's interest in protecting the safety of its residents is paramount.

Moreover, "[t]he party seeking to have the Court apply foreign law bears the burden of providing the Court with information concerning the foreign law it claims should be applied." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 88 (D.D.C. 2010) (citing *Oparaugo v.*

44

*Watts*, 884 A.2d 63, 71 (D.C. 2005)).  Judge Lamberth's exceedingly thorough explanation and application of Israeli negligence law in *Wultz* provides all the information the Court would require to properly entertain Plaintiffs' claim of negligence arising under Israeli law.  755 F. Supp. 2d at 57-67.  The PA, on the other hand, has pointed to no authority on the West Bank's law of negligence, nor has it even ventured to explain how it differs from Israeli negligence law. Accordingly, only Plaintiffs have met their burden of providing the Court with information about how foreign law should be applied.

Finally, Plaintiffs have adequately pled a claim of negligence under Israeli law because they have alleged that the PA is responsible for the April 2011 attack because it: (1) employed the culpable security officers; and (2) had a pattern and practice of facilitating and encouraging acts of terror, as demonstrated most directly by its retention, promotion, and placement of Saabneh at Joseph's Tomb.  Compl. ¶¶ 25-46.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be denied.

Respectfully submitted,

_____/s/_____

| | |
|---|---|
| Alan I. Baron (D.C. Bar No. 340273) | Joseph B. Espo (D.C. Bar No. 429699) |
| 975 F. Street, NW, Suite 100 | Andrew D. Levy (D.C. Bar No. 458998) |
| Washington, DC 20004 | Jessica P. Weber (admitted *pro hac vice*) |
| Telephone:  (202) 828-3589 | BROWN, GOLDSTEIN & LEVY, LLP |
| Facsimile:  (202) 828-5393 | 120 E. Baltimore St., Suite 1700 |
| abaron@seyfarth.com | Baltimore, Maryland  21202-6701 |
| | Telephone:  (410) 962-1030 |
| | Facsimile:  (410) 385-0869 |
| | jbe@browngold.com |
| | adl@browngold.com |
| | jweber@browngold.com |

*Attorneys for Plaintiffs*

45